# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

UNITED STATES OF AMERICA,      )
STATE OF INDIANA, ex rel.       )
YORK HOWZE, Relator,         )
                                 )
       **Plaintiffs,**         )
                                 )
v.                            )      **No. 1:11-cv-00035-JD-SLC**
                                 )
SLEEP CENTERS OF FORT WAYNE,  )
LLC,                       )
                                 )
       **Defendant.**        )

## REPORT AND RECOMMENDATION

Before the Court is a motion for judgment on the pleadings filed on April 27, 2016, by

Defendant Sleep Centers of Fort Wayne, LLC ("Sleep Centers"). (DE 145). Sleep Centers filed

a brief and exhibit in support of its motion. (DE 146). Plaintiff York Howze ("Howze") filed his

response in opposition to the motion on May 19, 2016. (DE 147). Sleep Centers filed a reply

brief in support of its motion for judgment on the pleadings. (DE 149). Sleep Centers also

moved to strike Howze's response, on grounds that it was filed untimely three days late. (DE

148). Howze filed a response to Sleep Centers' motion to strike, stating that he had 28 days to

file his response brief to Sleep Centers' motion for judgment on the pleadings pursuant to Local

Rule 56-1(b)(1)(A). (DE 150). Sleep Centers' motion for judgment on the pleadings, along with

its motion to strike Howze's response brief, were referred to the undersigned for a report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (DE 154). For the following reasons, I

will RECOMMEND that Sleep Centers' motion to strike (DE 148) be DENIED and that Sleep

Centers' motion for judgment on the pleadings (DE 145) be GRANTED IN PART and DENIED

IN PART.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Howze is a black board-registered sleep technician, who worked at Sleep Centers from 2007 until 2010. (DE 4 ¶¶ 1, 6, 15). Howze's initial job description as Operations Manager was identical to that of Farren Klopfenstein, in that they were supposed to co-manage the center in Fort Wayne with equal responsibilities, although Klopfenstein's description was "weighted toward Human Resources, Finance, [and] Scoring Records" while Howze's job description was more "weighted toward Operations and facilities management." (DE 4 ¶ 6).

In May 2007, Amy Clevenger, an employee of Tri-State Medical Group ("TSMG"), the company that Sleep Centers hired to handle its credentialing with the Centers for Medicare and Medicaid Services ("CMS"), began a Medicare provider application for Sleep Centers. (DE 4 ¶ 7). Clevenger emailed Stephen Smith, the CEO of Sleep Centers, with a list of questions regarding the corporate structure and how the center should be credentialed under Medicare and Medicaid. (DE 4 ¶ 7). Smith forwarded the email to Howze and Klopfenstein, asking that they answer Clevenger's questions; Howze never received the email. (DE 4 ¶ 7). Klopfenstein did receive the email, and she responded to Clevenger by answering most of the questions, although she did not know the answer to Clevenger's questions regarding Medicare and Medicaid or her questions regarding whether the center was an independent diagnostic testing facility ("IDTF") or a group practice. (DE 4 ¶ 7). Howze also did not know the answers to these questions. (DE 4 ¶ 7).

Clevenger called CMS for guidance regarding the application. (DE 4 ¶ 8). Clevenger then "knowingly credentialed the Sleep Center incorrectly using the incorrect application form

and incorrectly designating the Center as being part of a 'Group Practice' when the Center should have been classified using the CMS 855B application form and designated as an 'Independent Diagnostic Testing Facility.'" (DE 4 ¶ 8). Howze had no involvement with the credentialing process. (DE 4 ¶ 8). Clevenger sent the application to Smith for his review and signature, and she then forwarded the application to CMS. (DE 4 ¶ 8). Clevenger's actions "led to a negligently submitted Medicare provider application which prompted some 1500 fraudulent claims submitted to CMS between 2007-2009." (DE 4 ¶ 7).

In January 2009, Howze's job description changed from Operations Manager to the position of Compliance Officer/Finance Manager. (DE 4 ¶ 11). Howze perceived this change in roles to be a demotion based on his race, and he later filed an EEOC complaint in March 2010. (DE 4 ¶ 6).

In early September 2009, another employee who worked at Sleep Centers gave an article to Howze from a conference that the employee had attended. (DE 4 ¶ 12). The employee informed Howze that everyone at the conference had been concerned about a sleep lab in Texas that had been investigated by CMS for not being properly credentialed. (DE 4 ¶ 12). Howze read the article, which recommended that all sleep centers ensure that they were "properly credentialed" with CMS either as an IDTF, a group practice, or as a hospital. (DE 4 ¶ 12).

On September 3, 2009, Howze emailed Clevenger to ask her whether the center was credentialed as an IDTF. (DE 4 ¶ 12). Clevenger responded, "No, and it could be the reason why I am having trouble getting reimbursed for Medicaid." (DE 4 ¶ 12). Clevenger also stated to Howze that "she had not kept up with changes in Medicare/Medicaid in years . . . ." (DE 4 ¶ 12).

While both Howze and Klopfenstein were familiar with the rules that applied to hospital-based sleep centers, they were unaware that the IDTF rules and standards were applicable to the center, because they had not been provided with the necessary training. (DE 4 ¶ 13). On September 8, 2009, Clevenger told Howze that the center had "the 'option' of filing as an IDTF." (DE 4 ¶ 14). Howze was "skeptical" of this being just an "option," and he therefore "continued to ask [via email] whether they should still bill Medicare for patients while the [center was] knowingly improperly credentialed." (DE 4 ¶ 14).

Under the business plan approved by the Board before the opening of the center, Howze was to provide for proximate supervision, in that he was supposed to work nights, while Klopfenstein worked days. (DE 4 ¶ 15). However, Smith changed this by ordering Howze to work primarily on days in order to assist Klopfenstein. (DE 4 ¶ 15). On September 10, 2009, Howze was informed that the method of remote viewing by computer links that Sleep Centers was using "did not qualify as 'proximate supervision' per Medicare/Medicaid criteria which required a Board of Registered Polysummographic Technologist to supervise the studies." (DE 4 ¶ 15). Howze then began scheduling meetings with Sleep Centers' board-registered technicians in order to inform them that they had the responsibility to cover and train technicians at night. (DE 4 ¶ 15). After Howze had one such meeting, he was "abruptly removed as Operations Manager and the untrained Klopfenstein was installed in Howze's place." (DE 4 ¶ 15). Klopfenstein then told Howze that she was not going to continue having meetings with the registered technicians, nor would she require them to provide coverage for non-registered technicians. (DE 4 ¶ 15).

Also on September 10, 2009, Smith emailed Howze, Klopfenstein, and Clevenger

regarding Clevenger's alleged reasoning for credentialing the center as a group practice, stating that this was done because the "Neurology Division of [Allied Physicians Incorporated] was in the business of billing for the facility component of our leased beds at Lutheran and St. Joe," so Clevenger filed the application as a group practice since the same doctors were involved. (DE 4 ¶ 16). Smith also stated in the email that "Klopfenstein tells me she raised the point that we were an IDTF back in 2007." (DE 4 ¶ 16). Howze, however, had only had conversations with Klopfenstein in which she denied that the center should have been an IDTF. (DE 4 ¶ 16). Howze was particularly concerned about this because Klopfenstein had turned away an inspector from CMS who came to do a mandatory inspection of the center in January 2008 while Howze was on vacation. (DE 4 ¶ 16). Howze asked why, if Klopfenstein had "known all along," would she would turn away an inspector for a mandatory inspection. (DE 4 ¶ 16). He received no reply. (DE 4 ¶ 16).

Later in September 2009, Smith and Klopfenstein pressured Howze to verify that he had been providing supervision that met compliance standards during the time period that he had been removed from supervising at night. (DE 4 ¶ 15). Smith threatened to tell the Board that Howze was not doing his job, since they "[had] no other choice but to say [Howze] covered nights," since he was "salaried, so there is no way to say" that Howze did not cover nights. (DE 4 ¶ 15). Klopfenstein and Smith also told Howze that the complaints filed against him during the night shifts were proof that proximate supervision was present. (DE 4 ¶ 15). Additionally, Klopfenstein tried to get Howze and other staff members to say that she worked nights to cover, although she "rarely if ever supervised night staff." (DE 4 ¶ 15).

On September 22, 2009, someone by the name of "Mattox," who is otherwise undefined

in Howze's complaint, "answered questions as to whether or not the Sleep Center was indeed an IDTF and whether or not there was significant exposure to the Center for having violated Stark, anti-kickback, and Medicare/Medicaid laws due to the misfiling of the Sleep Center as a 'Group Practice' as opposed to an 'Independent Diagnostic Testing Facility.'" (DE 4 ¶ 17). At this apparent meeting with "Mattox," it was noted that repayment might be necessary. (DE 4 ¶ 17).

On September 24, 2009, Smith sent an email to Sleep Centers' staff, informing them that the company was "committed to fully disclosing to the Centers for Medicare and Medicaid Services the nature of the Sleep Center's non-compliant state regardless of the cost, though he had been properly advised on how to handle the matter." (DE 4 ¶ 18). Later that same day, Smith "changed this strategy," by placing the blame on CMS because it should have caught Clevenger's mistake, and further stating that Clevenger was following the advice of CMS to write in "Sleep Center" on the "other" space on the application. (DE 4 ¶ 19). Smith implemented a strategy to avoid full disclosure of all non-compliance issues by focusing only on the incorrect "clerical error" on the application. (DE 4 ¶ 20). Smith informed CMS that Sleep Centers had always been in compliance, even though he knew from Howze that over 800 studies were billed under "Group Practice," when the studies did not have appropriate supervision and were performed by under-qualified staff. (DE 4 ¶ 20). When Howze informed the Board, Smith, and Clevenger that CMS holds the provider responsible for the veracity of the information provided in an application, Howze was then removed as a point-of-contact for the credentialing process, and he was forbidden to call CMS. (DE 4 ¶ 20).

Also on September 24, 2009, Sleep Centers suspended the performance of Medicare/Medicaid sleep studies. (DE 4 ¶ 21). Howze sent an email to the Medical Director

that day, in which he voiced his concerns and oppositions to Smith's plan to rely on the clerical error as the only issue of non-compliance, instead of following the Board's plan to fully disclose all non-compliance issues. (DE 4 ¶ 22).

The next day, on September 25, 2009, Howze sent an email to Smith to try to convince him not to continue his strategy of blaming CMS for the problems in the center's credentialing application. (DE 4 ¶ 23). Howze informed Smith "that the Center had already identified hundreds of studies that were performed by the Center that were non-compliant and should not have been billed to Medicare/Medicaid," and tried to convince Smith that a "clerical error" would not cover the violations of both the IDTF and state standards. (DE 4 ¶ 23). In response, Smith told Howze to "get with the program," threatened Howze's employment, and placed blame on Howze. (DE 4 ¶ 23).

On October 30, 2009, Howze suggested via email to Smith that the center should not wait for a response from CMS for guidance, but rather should file a correct application. (DE 4 ¶ 24). "Smith's response alerted [Howze] to the continued false intentions of the Board and Smith to defraud the government by using a strategy that was designed to avoid paying back each and every study that the Center performed as a Group Practice." (DE 4 ¶ 24). In November 2009, Sleep Centers gave up on waiting for a response from CMS. (DE 4 ¶ 25). Smith was informed by someone at CMS that he would be waiting for a long time for a response from CMS, and was further informed that CMS would not recognize anything other than a proper re-filing of the application. (DE 4 ¶ 25). Howze continued to work on the application to properly reapply. (DE 4 ¶ 25).

In November 2009, Smith directed Howze to review the application with Clevenger. (DE

4 ¶ 26). Howze or Klopfenstein, as the co-managers, were the only authorized signees who could initial each page of the application. (DE 4 ¶ 26). Howze did not feel comfortable with the veracity of the application, so he refused to initial the pages. (DE 4 ¶ 26). Smith repeatedly threatened Howze over two days to try to get Howze to initial the pages. (DE 4 ¶ 26). Howze refused to sign it, and Klopfenstein was never asked or coerced to sign it the way that Howze was. (DE 4 ¶ 26). Later that month, Smith announced that there was an error in the application, because it did not identify the past or present billing arrangement with Fort Wayne Neurology. (DE 4 ¶ 27). Howze believes that Smith had been trying to make Howze "an unwitting conspirator to fraud," by getting him to sign the application when it contained such errors. (DE 4 ¶ 27).

In January 2010, Howze was assigned to project the budget for the year, and during that work, he discovered problems with the numbers in the profit and loss statements for wages and salaries. (DE 4 ¶¶ 28-29). On about February 24, 2010, Howze informed Klopfenstein of the problem, and asked that she meet with him to compare records in order to account for everyone's time. (DE 4 ¶ 29). This situation resulted in discord between Howze and Klopfenstein, which Smith characterized as a "turf war" when Howze informed him of the situation. (DE 4 ¶ 29). Howze at that point began drafting an EEOC complaint, while also looking for both a lawyer and another job. (DE 4 ¶ 29). During this time, Smith was trying to find a lawyer to represent Sleep Centers against TSMG regarding the misfiling, while Clevenger was attempting to work with CMS to see if she could set the start date for the new credential application to date back to the opening of the center in October 2007. (DE 4 ¶ 29). The start date came back from CMS as November 9, 2009, which was the date of the new application. (DE 4 ¶ 29). Howze filed his

complaint with the EEOC in March 2010.  (DE 4 ¶ 6).

During a meeting with Klopfenstein on March 16, 2010, she asked Howze whether he intended on filing a qui tam lawsuit.  (DE 4 ¶ 31).  Howze did not answer her question, as he thought it was inappropriate.  (DE 4 ¶ 31).  At the end of that day, Howze was called into human resources, where he was given 43 complaints against him by Sleep Centers staff members who felt threatened by Howze.  (DE 4 ¶ 31).  Howze denied all the allegations.  (DE 4 ¶ 31).

On March 18, 2010, Clevenger informed Howze and all board members that CMS had left her a voicemail stating that all of the billing issues related to Medicare were resolved.  (DE 4 ¶ 32).  Smith announced that this was the end of the Medicare/Medicaid issue, and now they could all start to rebuild the company.  (DE 4 ¶ 32).  The next day, on March 19, 2010, Howze was told to come into human resources.  (DE 4 ¶ 33).  When he arrived there, Howze was told he was terminated.  (DE 4 ¶ 33).  Smith informed Howze that he could receive three months pay and his unemployment would not be contested if he would sign a statement that he was absolving Sleep Centers of any claims he had.  (DE 4 ¶ 33).

On January 24, 2011, Howze, as Relator on behalf of the United States, filed this whistleblower action against Sleep Centers as well as a since-dismissed Defendant, Allied Physicians Incorporated.  (DE 1).  In his amended complaint, he alleged violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the FCA"), the Indiana False Claims Act, Ind. Code § 5-11-5.5 ("the Indiana FCA"), the Indiana Medicaid Fraud Statute, Ind. Code § 35-43-5-7.1, and the Indiana Whistleblower Act, Ind. Code § 5-11-5.5, as well as wrongful discharge in violation of 31 U.S.C. § 3730(h).  (DE 4).  The United States declined to intervene in this case.  (DE 11, DE 12).  Howze's claim for wrongful discharge and his claims against Allied Physicians

Incorporated were dismissed by the Court on March 11, 2013. (DE 73). Howze's complaint is thus proceeding against Sleep Centers on only his claims for violation of the FCA, the Indiana FCA, and the Indiana Medicaid Fraud Statute.

## II. STANDARD OF REVIEW

A motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), permits a party to move for judgment after the complaint and answer have been filed by the parties. When reviewing Rule 12(c) motions, a court must review the pleadings under the same standard that applies when reviewing motions to dismiss for failure to state a claim under Rule 12(b)(6): "the complaint must state a claim that is plausible on its face." *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016) (quoting *Vinson v. Vermilion Cty.*, 776 F.3d 924, 928 (7th Cir. 2015)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing a motion for judgment on the pleadings, [the court] draw[s] all reasonable inferences and facts in favor of the nonmovant, but need not accept as true any legal assertions." *Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016) (citing *Vesely v. Armslist LLC*, 762 F.3d 661, 664-65 (7th Cir. 2014)).

## III. ANALYSIS

A court may rule on a Rule 12(c) motion based upon a review of the pleadings alone, which include the complaint, the answer, and any written instruments attached as exhibits. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside

the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Thus, the court "may (1) 'convert the 12[(c)] motion into a motion for summary judgment under Rule 56 and proceed in accordance with the latter rule,' or (2) 'exclude the documents attached to the motion [for judgment on the pleadings] and continue under Rule 12.'" *Tradewinds Glob. Logistics, LLC v. Garrett's Transp., LLC*, No. 115CV00608RLYDKL, 2015 WL 8362401, at *2 (S.D. Ind. Dec. 8, 2015) (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)). The court has discretion in determining which option to choose. *Id.* (citations omitted).

Here, Howze has attached exhibits to his response in opposition to the motion for judgment on the pleadings. (DE 147-1, DE 147-2). These exhibits are emails, which Howze references to support his contention that there is a genuine dispute regarding whether Sleep Centers' applications contained incomplete or incorrect information. (DE 147 at 7-8). The first exhibit (DE 147-1), an email dated October 30, 2009, from Steve Smith to Howze and others, was referenced by Howze in his amended complaint. (DE 4 ¶ 24). The second exhibit (DE 147-2), an email dated December 3, 2009, from Clevenger to Howze and others, was not referenced in either Howze's amended complaint or Sleep Centers' answer. These emails attached as exhibits are evidence outside of the pleadings, and because Sleep Centers specifically brought this motion under Rule 12(c) and used that procedural standard, I will exclude this evidence and will consider the merits of Sleep Centers' motion under Rule 12(c).

Before turning to the substance of Sleep Centers' motion for judgment on the pleadings, its motion to strike must first be addressed. Sleep Centers' motion to strike was filed in the docket as a "Rule 12(f) Motion to Strike." (DE 148). Under Rule 12(f) of the Federal Rules of

Civil Procedure, a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Here, Sleep Centers is seeking to strike Howze's response brief, not a portion of a pleading, and thus the motion is not proper under Rule 12(f). In the motion, Sleep Centers states that under the Local Rules and Rule 6 of the Federal Rules of Civil Procedure, Howze's response was due on or before May 16, 2016. (DE 148 ¶¶ 2-3). Because Howze's response was filed on May 19, 2016, Sleep Centers requests that the Court strike the response. (DE 148 ¶¶ 4-6). Howze explained in his response to the motion to strike that he had 28 days pursuant to Local Rule 56's deadlines for responding to a motion for summary judgment. (DE 150). While a motion for judgment on the pleadings is not a motion for summary judgment, it could potentially be dispositive of the case. It is understandable as to why Howze might think Local Rule 56's deadline of 28 days applied here. Furthermore, Howze's response was only a few days late according to Sleep Centers' calculation. Such a minor mistake does not warrant striking Howze's response brief, which will be useful to the Court in determining the merits of Sleep Centers' motion for judgment on the pleadings. Accordingly, I will RECOMMEND that Sleep Centers' motion to strike (DE 148) be DENIED, and I will consider Howze's response brief for purposes of making a recommendation regarding Sleep Centers' motion for judgment on the pleadings.

Turning now to Sleep Centers' motion for judgment on the pleadings, Sleep Centers has proffered two bases for its motion: (1) that no private cause of action exists under the Indiana Medicaid Fraud Statute; and (2) that Howze's allegations in his amended complaint disprove his own theories for violations of the FCA and Indiana FCA. I will address each of these arguments in turn.

## A. Howze's Claim Under the Indiana Medicaid Fraud Statute

Sleep Centers argues that it is entitled to judgment on the pleadings regarding Howze's claim in Count II of his amended complaint. As part of Count II, Howze alleged that Sleep Centers engaged in a conspiracy to submit false claims in violation of the Indiana Medicaid Fraud Statute. (DE 4 ¶¶ 36-38). Sleep Centers, in its motion, contends that there is no private cause of action under this statute, and thus argues that Howze's claim must fail as a matter of law.

Howze, in his response, admits that there is no private right of action under the Indiana Medicaid Fraud Statute. (DE 147 at 19). However, Howze argues that Count II of his amended complaint should not be dismissed because it also identifies the Indiana FCA and Indiana's Whistleblower Act as supporting his claim for relief.

In its reply brief, Sleep Centers characterizes Howze's response as an attempt to amend his complaint to allege a claim under the Whistleblower Act. Sleep Centers has apparently missed the inclusion of the Whistleblower Act in Count II of Howze's amended complaint. (*See* DE 4 ¶¶ 36-38). Because Count II of Howze's amended complaint alleges violations of both the Indiana FCA and the Indiana Whistleblower Act in addition to a violation of the Indiana Medicaid Fraud Statute, judgment on the pleadings is not appropriate on the entirety of Howze's claim in Count II. I will therefore RECOMMEND that judgment on the pleadings be GRANTED to Sleep Centers on the portion of Count II brought under the Indiana Medicaid Fraud Statute. Thus, Howze's claims in Count II under the Indiana FCA and the Indiana Whistleblower Act still remain.

## B.  Howze's Claims Under the FCA and Indiana FCA

Sleep Centers argues that it is entitled to judgment on the pleadings on Howze's claims

made under the FCA and the Indiana FCA because the allegations in Howze's amended

complaint disprove his theories of violation.[1]  Sleep Centers takes issue with the following

statements that Sleep Centers contends Howze alleged in his amended complaint: (1) that Howze

alleged that Sleep Centers sought and followed the guidance of CMS regarding its initial

enrollment and re-enrollment; (2) that Howze alleged that Form 855B was negligently

completed, rather than knowingly made falsely; (3) that Howze alleged that Sleep Centers was

required to register with CMS as an IDTF, but failed to do so; and (4) that Howze alleged his

claims under an implied certification theory and because Howze failed to allege the violations

were a condition of payment.

### 1.  Sleep Centers' Reliance on Guidance from CMS

Sleep Centers states, in its brief in support of its motion for judgment on the pleadings,

that Howze's amended complaint alleged that Sleep Centers "sought and followed the express

guidance of CMS regarding its initial enrollment and re-enrollment."  (DE 146 at 6).   Sleep

Centers thus argues that it is entitled to judgment on the pleadings because it cannot be held

liable under the FCA where it followed the government's express directions.  (DE 146 at 6

(citing *United States ex rel Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999))).

Sleep Centers has mischaracterized or misunderstood the allegations in Howze's

---

[1]  Because the Indiana FCA "mirrors the Federal FCA in all material respects," the
analysis of the Federal FCA is equally applicable to Howze's Indiana FCA claims.  *United States
ex rel. Herron v. Indianapolis Neurosurgical Grp., Inc.*, No. 1:06-cv-1778-JMS-DML, 2013 WL
652538, at *7 (S.D. Ind. Feb. 21, 2013) (citations omitted).

amended complaint. The amended complaint's relevant allegations are that, "[t]o complete the application, Clevenger called the Centers for Medicare and Medicaid Services to seek guidance." (DE 4 ¶ 8). While this sentence, taken alone, would appear to support Sleep Centers' interpretation, the very next sentence states that "Clevenger[] knowingly credentialed the Sleep Center incorrectly using the incorrect application form and incorrectly designating the Center as being part of a 'Group Practice' when the Center should have been classified using the CMS 855B application form and designated as an 'Independent Diagnostic Testing Facility.'" (DE 4 ¶ 8).

The amended complaint does not allege that Clevenger followed any guidance she received from CMS, nor does the complaint allege what any such guidance consisted of. Later in the amended complaint, Howze alleges that it was not until September 2009 when Smith "adopted a new 'strategy' to avoid the full disclosure of all issues of non-compliance," by essentially contending that it was all a "clerical error" that CMS should have caught, which was caused by CMS advising Clevenger "to write in 'Sleep Center' in the 'other' space." (DE 4 ¶¶ 19-20). Thus, it is evident from the amended complaint that Howze has not alleged that Sleep Centers was merely following guidance from CMS when it completed its application forms; rather Howze alleges that Sleep Centers' applications were knowingly completed incorrectly, as part of a scheme to defraud the United States Medicaid and Medicare programs.

Accordingly, Sleep Centers' argument—that it cannot be held liable under the FCA because it was only following CMS's guidance—fails, because that is not what is actually alleged by Howze in the pleadings. The inference that Sleep Centers seeks to draw from the allegations in Howze's complaint is not one that has been drawn in favor of the plaintiff, and thus it is an

improper inference for purposes of a motion for judgment on the pleadings under Rule 12(c).

*See Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000) ("We accept all well-pleaded

allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."

(citations omitted)).

### 2. "Negligent" Completion of CMS Forms

Sleep Centers next argues that Howze's amended complaint "shows a lack of knowing

fraud by the Sleep Center" because Howze alleges that "Form 855B was 'negligently'

completed." (DE 146 at 7). Sleep Centers contends that "a violation of the FCA requires that

'the defendant presented . . . a claim to the government, that the claim was false, *and that the*

*defendant knew the claim was false*.'" (DE 146 at 7 (quoting *U.S. ex rel. Davis v. Dist. of*

*Columbia*, 793 F.3d 120, 124 (D.C. Cir. 2015)) (alteration in original)). Thus, because Howze

alleged that Clevenger completed the form "negligently," Sleep Centers argues that Howze has

"plead[ed] himself out of court by unnecessarily alleging facts which, all unwittingly on his part,

demonstrate that he has no legal claim." (DE 146 at 8 (quoting *Trevino v. Union Pac. R.R. Co.*,

916 F.2d 1230, 1234 (7th Cir. 1990))).

Howze's amended complaint states that "[i]n May 2007, Amy Clevenger . . . began a

process that led to a negligently submitted Medicare provider application which prompted some

1500 fraudulent claims submitted to CMS between 2007-2009." (DE 4 ¶ 7). While the word

"negligently" is included to describe the submission of the application in Paragraph 7, Paragraph

8 states that "Clevenger, knowingly credentialed the Sleep Center incorrectly . . . ." (DE 4 ¶ 8).

Additionally, other portions of the amended complaint allege that Sleep Centers "systematically

and knowingly upcoded tests . . . in violation of CMS" rules (DE 4 ¶ 10), that Howze had asked

Sleep Centers "whether they should still bill Medicare for patients while the Defendants were knowingly improperly credentialed" (DE 4 ¶ 14), and that the center had refused to correct the proximate supervision problem and stopped Howze from attempting to do so (DE 4 ¶ 15).

As discussed above, the court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Forseth*, 199 F.3d at 368. Here, the reasonable inference to be drawn—in Howze's favor—from the amended complaint is that Sleep Centers made knowingly false claims in violation of the FCA. Sleep Centers' argument regarding the single use of the word "negligently" in the amended complaint is unpersuasive.

### 3. Requirement to Register as an IDTF

Sleep Centers' next argument is that Howze's amended complaint is based on his assumption that Sleep Centers was required to register with CMS as an IDTF, and that Howze then contends that Sleep Centers failed to comply with the requirement. Sleep Centers states that Howze's amended complaint correctly cites "the general rule that physicians, group practices, *or* IDTFs can bill under the physician fee schedule." (DE 146 at 8 (citing 42 C.F.R. § 410.33(a))). Sleep Centers then argues that Howze's complaint "attempts to suggest that Section 410.33 does something that it does not do: require enrollment as IDTFs," when enrollment as an IDTF is an option under Section 410.33, not a requirement. (DE 146 at 9).

Sleep Centers appears to have again mischaracterized the allegations in Howze's amended complaint. Howze does not allege that Sleep Centers was required to register as an IDTF because only IDTFs are permitted under Section 410.33. Rather, Howze alleges that Sleep Centers should have been registered as an IDTF rather than a group practice given the structure

of the center, because the center itself was not a group practice of physicians, but rather was owned in large part by Fort Wayne Neurology, which was itself a group practice. (DE 4 at 14). Additionally, Howze alleged that the center failed to meet the requirements for IDTFs, including failing to have a site visit, failing to staff adequate physician supervision, failing to staff properly credentialed or qualified nonphysician technicians, failing to properly identify supervisory physicians, failing to comply with state law requirements for IDTFs, failing to properly catalog equipment and provide a physical facility with adequate patient privacy accommodations, failing to make its equipment available to CMS for inspection, failing to maintain proper inventory of the diagnostic testing equipment, failing to meet insurance requirements for an IDTF, etc. (DE 4 at 14-22). Thus, Howze takes issue with the center's attempt to say it was an IDTF all along since it opened in 2007, rather than a group practice. (DE 4 ¶ 16). While Howze does allege that the center incorrectly designated on the wrong application form "as being part of a 'Group Practice' when the Center should have been classified using the CMS 855B application form and designated as an 'Independent Diagnostic Testing Facility'" (DE 4 ¶ 8), Howze also alleges that this "inappropriate submission" was the basis for Sleep Centers' scheme "to defraud the United States Government through false claims, deceptions, and lies-of-omission in order to cover-up" the faulty application. (DE 4 ¶ 6).

Sleep Centers argues that it properly billed for its services under Section 410.33(a) as a group practice, but this was not alleged by Howze in the complaint. Instead, the complaint alleges that Sleep Centers improperly registered as a group practice when it was not qualified to do so; that it should have registered as an IDTF, but did not; and that it violated many requirements for IDTFs, and thus its billing to CMS was improper, as the center did not comply

with any category permitted to bill under the physician fee schedule.  Thus, Sleep Centers'

argument that Howze's "theory of falsity is fatally insufficient" fails, and judgment on the

pleadings is therefore improper on that basis.

### 4. *Adequacy of Howze's Claims Under the FCA*

Sleep Centers contends that Howze's amended complaint does not allege that Sleep

Centers submitted claims that were "actually false," but rather alleges that the claims were

"impliedly false" because they were submitted when the center was enrolled as a group practice

rather than an IDTF.  (DE 146 at 9-10).  Sleep Centers argues that "[e]ven if the Court were to

expand FCA liability in this Circuit to encompass the implied certification theory, the Seventh

Circuit explicitly refuses to consider the possibility of such theories in cases where the purported

implied certifications were not conditions of payment . . . ."  (DE 146 at 10 (citing *United States*

*ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005); *United*

*States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 711 (7th Cir.

2014))).  Sleep Centers argues that Howze did not allege that the center's failure to register as an

IDTF and comply with Section 410.33(a) was a violation of a condition of payment, and thus

contends that Howze has failed to allege a violation of the FCA even under implied certification

theory.

In response, Howze argues that his complaint does not rely upon an implied certification

theory of liability under the FCA.  Howze states that Sleep Centers has reduced the entirety of the

allegations in his amended complaint into "a single mistake of checking the wrong box on form

855B," which Sleep Centers contends is an "implied certification."  (DE 147 at 17).  Howze

contends that Sleep Centers is ignoring the rest of the allegations of his amended complaint,

which detail a multitude of violations as part of a scheme to fraudulently collect payments from Medicare and Medicaid. Howze distinguishes the case cited by Sleep Centers, *Gross*, stating that it was a case in which the plaintiff failed to allege that any of the deviations from federal requirements were linked to payment of federal funds. Here, in contrast, Howze has alleged that the purpose of Sleep Centers' violations and scheme to coverup the violations was to increase its revenues by billing Medicare and Medicaid for sleep studies which were not eligible for reimbursement. (DE 147 at 18).

In its reply brief, Sleep Centers states that Howze has misunderstood the meaning of implied certification in FCA cases. Sleep Centers contends that this is an implied certification case because Howze "does not allege that any of the actual claims contained any falsehood," but rather that "by submitting the claims, Sleep Centers was impliedly certifying compliance with 42 C.F.R. § 410.33(a), when, in his opinion, it was not in compliance." (DE 149 at 3). Sleep Centers argues that "[t]his is the very definition of an 'implied certification' case." (DE 149 at 3). Sleep Centers refers back to *Gross* as supporting its position, stating that the Seventh Circuit affirmed dismissal in *Gross* because the plaintiff had "failed to allege that any particular condition of regulatory compliance was a condition of payment of government money." (DE 149 at 3 (quoting *Gross*, 415 F.3d at 605)). Here, Sleep Centers argues that Howze failed to allege that certification of compliance with Section 410.33(a) was a condition of payment of government money—which Sleep Centers states is not actually any such condition. (DE 149 at 3).

"The FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *Gross*, 415 F.3d at

604. The FCA imposes liability upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id.* (quoting 31 U.S.C. § 3729(a)(2)); (DE 4 ¶ 34). "An FCA claim under § 3729(a)(2) has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *Gross*, 415 F.3d at 604 (citing 31 U.S.C. § 3729(a)(2); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)). "An FCA claim premised upon an alleged false certification of compliance also requires that the certification of compliance be a condition of or prerequisite to government payment. *Id.* (collecting cases); *see also Absher*, 764 F.3d at 710-11 (stating that the requirements under the false certification theory of FCA liability are that the defendant "certified that it had complied with particular statutes or regulations that were conditions of, or prerequisites to, government payment," that the defendant "did not actually comply with those conditions," and that the defendant "knew that it had failed to comply with those conditions" (citing *Gross*, 415 F.3d at 604)).

Here, Howze has alleged that Sleep Centers certified that it was in compliance with CMS regulations required for payment when it completed its CMS application form, which wrongly designated the center as a group practice. Howze has alleged that this certification was false, as the center was actually an IDTF and should have been designated as an IDTF. Howze has further alleged that Sleep Centers knew the certification was false. The amended complaint goes into detail, specifically alleging that the center was "knowingly credentialed . . . incorrectly." (DE 4 ¶ 8). Howze alleges that Sleep Centers took the position that it had been an IDTF all along (DE 4 ¶¶ 16-20), and that Sleep Centers had been informed of its violations of IDTF standards (DE 4 ¶

20).  Howze alleges a litany of violations of IDTF standards, including that over 800 studies were billed despite being performed by under qualified staff without adequate supervision.  (*See* DE 4 - Issues A through Q of Count I).  Additionally, Howze alleges that compliance with these IDTF standards was required in order to receive payment from CMS.  (DE 4 - Issue Q of Count 1).  While Howze's amended complaint was not artfully pled and is hard to follow at times, it does contain the minimal pleading requirements to assert a claim under § 3729(a)(2).

In Sleep Centers' reply brief, it argues that compliance with Section 410.33(a) is "not a condition of payment . . . and cannot form the basis for an FCA action."  (DE 149 at 2).  Sleep Centers contends that Howze failed "to respond to this essential point" in his response, and states that such failure "warrants the granting" of Sleep Centers' motion for judgment on the pleadings.  Howze's amended complaint references multiple subsections of Section 410.33, not only 410.33(a), as he alleges violations of nearly every subpart of Section 410.33(g).  Additionally, Howze references Section 410.33(h), which states that an IDTF that fails to meet the standards outlined in paragraph (g) will not be eligible to bill CMS.  Thus, Howze has adequately alleged that Sleep Centers' violations were a "condition of payment."

As to Sleep Centers' contention that Howze's claim under the FCA is an implied certification case, which theory of liability has not been accepted by the Seventh Circuit, this argument fails for several reasons.  As explained in *Absher*, the implied certification theory of liability arose where the plaintiff alleged that the defendant "impliedly certified that it was in compliance with Medicare and Medicaid regulations by accepting daily payments for their patients when, in fact, the facility was systematically violating a number of these regulations . . . ."  764 F.3d at 711.  Here, Howze has not alleged that the acceptance of daily payments was the

22

basis for Sleep Centers' "certification," as required for FCA claims. Instead, Howze alleges that Sleep Centers actually certified that it was in compliance with the regulations when it completed the CMS application form. While Howze could also potentially proceed on an implied certification theory, his amended complaint alleges that Sleep Centers was knowingly credentialed incorrectly.

The Seventh Circuit decided *Absher* without resolving "whether *qui tam* plaintiffs may advance an implied certification theory in our circuit because the relators did not argue to the jury that the purported implied certifications were conditions of payment." *Id.* Sleep Centers cites to *United States v. Sanford-Brown, Ltd.*, for the Seventh Circuit's statement that declined to adopt the "so-called doctrine of implied certification." (DE 146 at 10 (citing *Sanford-Brown*, 788 F.3d 696, 711-12 (7th Cir. 2015))). Since the filing of the parties' briefs in this matter, however, the Supreme Court reversed the Seventh Circuit's decision in *Sanford-Brown*, holding that the implied false certification theory *can* serve as a basis for liability under the FCA. *See United States ex rel. Nelson v. Sanford-Brown, Ltd.*, 136 S. Ct. 2506 (2016) (vacating and remanding in light of the Supreme Court's decision in *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989 (2016)). Given the Supreme Court's specific finding that the implied certification theory can provide a basis for liability under the FCA, I need not address Sleep Centers' arguments regarding implied certification any further.

*5. Conclusion as to Howze's Claims Under the FCA and Indiana FCA*

Accordingly, I will RECOMMEND that Sleep Centers' motion for judgment on the pleadings be DENIED as it pertains to Howze's claims under the FCA and the Indiana FCA.

## IV. CONCLUSION

For these reasons, I RECOMMEND that Sleep Centers' motion to strike (DE 148) be DENIED and that Sleep Centers' motion for judgment on the pleadings (DE 145) be GRANTED IN PART regarding the portion of Count II brought under the Indiana Medicaid Fraud Statute and DENIED as to the remainder of the claims in Howze's amended complaint.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties.  NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings or recommendations.  Fed. R. Civ. P. 72(b).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Entered this 1st day of February 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge